# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

SPENDINGMONEY LLC,
    Plaintiff,

v.

AMERICAN EXPRESS CO., ET AL.,
    Defendants.

No. 3:08cv1376 (SRU)

## CLAIM CONSTRUCTION RULING

SpendingMoney LLC ("SpendingMoney") is the assignee of U.S. Patent No. 5,864,830 (the "'830 Patent"), Data Proceeding Method of Configuring and Monitoring the Satellite Spending Card Linked to A Host Card. On September 10, 2007, SpendingMoney filed this patent infringement suit against American Express Co. ("American Express") and Visa USA Inc. ("Visa"). Following the submission of initial and responsive claim construction memoranda by all parties, I held a full-day *Markman*[1] hearing at which the parties were given the opportunity to submit intrinsic and extrinsic evidence in support of their proffered claim constructions. Additionally, I received supplemental briefs from all parties concerning the construction of two means-plus-function claims at issue. After due consideration of all submissions, I now render this Claim Construction Ruling.

**I.    Background**

The '830 Patent was filed on February 13, 1997 as Application No. 08/799,953 and issued on January 26, 1999 to David Armetta and David Tempest. The invention sought to provide a solution to a problem: how a credit card holder can provide another person with a secondary card that (1) is on the same account, (2) has a limited spending capacity, and (3) has

---

[1] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995).

the advantages of a credit card rather than the problems and disadvantages of a debit card or stored value card. (*See* '830 Patent col. 1, ll. 17-67; col. 2, ll. 1-67.)

The '830 patent issued with ten claims. SpendingMoney is asserting infringement of Claims 1, 3, 6, 8 and 10 against American Express and Claims 1, 3, 6 and 10 against Visa. Each of the claim terms identified by the parties as requiring construction appears in Claim 1. Claim 1 reads:

> A data processing method of configuring a <u>satellite spending card</u> linked to a host credit card and issued by an issuer, the host credit card being held by a host cardholder and having an available balance defined in an associated host account data processing record of a data processing device, a predetermined spending capacity of the <u>satellite card</u> being selectively determined by the host cardholder, comprising the steps of:
> (a)     entering, into a data processing device, configuration data comprising an identifier of a satellite cardholder of a satellite card and a <u>host cardholder determined spending capacity</u> of the satellite card;
> (b)     subtracting, in the data processing device, the entered spending capacity of the satellite card from the <u>available balance of the host credit card</u>;
> (c)     storing, in a satellite account record in the data processing device, the configuration data entered in said step (a);
> (d)     linking, in the data processing device, the satellite account record to the host account record to facilitate future transfers of funds from the host account record to the satellite account record;
> (e)     defining a satellite account number associated with the satellite account for use in financial transactions carried out with the satellite card and limited in total amount to the satellite card spending capacity;
> (f)     issuing the satellite card having <u>means for storing on the satellite card the satellite account number</u> so that each purchase made with the satellite card by the satellite cardholder is debited from the satellite card spending capacity, and <u>means on the card for displaying at least a portion of the configuration data sufficient to identify the satellite cardholder</u> so that only the satellite cardholder identified on the satellite card can use the satellite card for financial transactions in a total amount limited by the satellite card spending capacity; and
> (g)     tendering the satellite card to the satellite cardholder for use by satellite cardholder in carrying out financial transactions with the satellite card and limited in total amount to the satellite card spending capacity.

('830 Patent col. 6, ll. 58-67, col. 7, ll. 1-31 (emphasis added).)

## II. General Principles of Claim Construction

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). Courts construe claims "to resolve disputes about claim terms and to assign a fixed, unambiguous, legally operative meaning to the claim," so that a patentee's right to exclude is clearly defined. *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004). Intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). Intrinsic evidence includes the patent itself, the claims, the specification, and the prosecution history if it is in evidence. *Vitronics*, 90 F.3d at 1582.

In considering intrinsic evidence, the court proceeds in the following order. First, the court must consider the words of the claims themselves to define the scope of the patented invention. *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 619-20 (Fed. Cir. 1995). Second, the court must review the specification, which contains a written description of the invention that must be clear and complete to enable one of ordinary skill in the art to make and use the invention. *Markman*, 52 F.3d at 979. The specification is "always highly relevant to the claim construction analysis" and is "the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. The Federal Circuit has cautioned, however, that because the claims define the invention, limitations from the specification should not be read into those claims. Rather, a claim should be read in light of the specification. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998).

Third, the court looks to the patent's prosecution history, if in evidence, which is a matter of public record. *Id.* at 1186. The prosecution history consists of the complete record of the proceedings before the Patent and Trademark Office, including the prior art cited during the patent examination and the applicant's acquiescence with regard to the prior art, which indicates what the claims do not cover. *Phillips*, 415 F.3d at 1317; *Liquid Dynamics Corp.*, 355 F.3d at 1367-68.

Courts properly may turn to and rely "on extrinsic evidence to construe a claim . . . only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." *Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001) (quotations and citations omitted). Extrinsic evidence "consists of all evidence external to the patent and prosecution history," such as dictionaries, learned treatises, and expert testimony. *Phillips*, 415 F.3d at 1317-18. The *Phillips* Court cautioned that "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of the claims in derogation of the [public record of intrinsic evidence], thereby undermining the public notice function of patents." *Id.* at 1318-19 (quotations and citations omitted).

In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent and claim construction involves little more than the application of the widely accepted meaning of commonly understood words. *Id.* at 1314.

The parties do not dispute these general tenets of claim construction. Rather, their disagreement arises from the application of these principles to the claim terms at issue in this case.

**III.   Construction of the Claim Terms at Issue**

The claim construction arguments concern four terms, all of which are found in Claim 1 of the '830 Patent: (1) "satellite spending card" or "satellite card"; (2) "available balance of the host credit card"; (3) "means for storing on the satellite card the satellite account number"; and (4) "means on the card for displaying at least a portion of the configuration data sufficient to identify the satellite cardholder." (Am. Joint Claim Const. Stmt., doc. # 94, hereinafter "JCC Stmt.")  At the *Markman* hearing on September 9, 2009, I ruled on the construction of the first and second terms. (*See* Transcript of Sept. 9, 2009, doc. # 101, hereinafter "Tr.")

The parties have agreed that the terms "data processing device" and "linking, in the data processing device, the satellite account record to the host account record" do not need construction and can be accorded their plain meaning. The parties have agreed on a construction of the term "host cardholder determined spending capacity" as "the maximum amount that can be spent using the satellite card, as fixed by the host cardholder." I adopt that construction.

Because the terms "means for storing on the satellite card the satellite account number" and "means on the card for displaying at least a portion of the configuration data sufficient to identify the satellite cardholder" utilize means-plus-function language, I must construe those terms in accordance with 35 U.S.C. § 112, ¶ 6.  Likewise, "satellite spending card" or "satellite card" do not appear to have an ordinary meaning to those skilled in the art. I do not address the claim construction arguments for "satellite spending card" or "satellite card" in detail because I ruled on that term from the bench at oral argument. (Tr. 55.)  As I indicated at the *Markman* hearing, I find that no claim construction is necessary for "available balance of the host credit card." (Tr. 58-59.)

A.  Term: "satellite spending card" or "satellite card"

The parties agreed that "satellite spending card" and "satellite card" should be construed identically. I construed these terms at the *Markman* hearing. The claim term satellite spending card or satellite card is construed as follows: "a prepaid spending card, which has the functionality of a credit card, and is linked to the host credit card." The reasons for the ruling were set forth in detail on the record at the hearing.

To summarize, I first considered the words of the claim. I turned next to the specification because the claim should be read "in light of the specification." *See Comark Commc'ns, Inc.*, 156 F.3d at 1186-87. The specification described "functionality" extensively and used the phrase "functionality of a credit card" to describe the invention and the advantages it presents over other types of cards. (Tr. 27-28, 47-48, 50-55.) *See Vitronics*, 90 F.3d at 1582 ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."). The particular language in the specification was not a limitation on the claims, but described and defined the claims and is appropriately incorporated into the claim construction.

B.  Term: "available balance of the host credit card"

As I indicated at the *Markman* hearing, I find that no claim construction is necessary for "available balance of the host credit card." The specification reads as follows: "The total debits on a credit card are referred to as the 'outstanding balance', while the remaining or available balance of the credit limit is typically called the 'available balance' and reflects the dynamically

adjusted current spending power of the credit card." ('830 Patent col. 1, ll. 46-51.)[2] The term is an ordinary term and its meaning is easily understood by a person of ordinary skill in the field of the invention.

C. <u>Means-Plus-Function Elements</u>

The parties agreed that the following two terms are means-plus-function elements governed by 35 U.S.C. § 112, ¶ 6, which states that claim elements "may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." Construction of means-plus-function claims is a two-step process: "First, we determine the claimed function. Second, we identify the corresponding structure in the written description that performs that function." *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005) (citation omitted).

The parties dispute whether the construction of the structure in each element should include the phrase "all structural equivalents thereof." SpendingMoney argues that, because paragraph 6 of section 112, which governs construction of means-plus-function elements, states that a "claim shall be construed to cover the corresponding structure . . . described in the specification *and all equivalents thereof*," my claim construction should reflect the language of the statute by expressly including "and all structural equivalent thereof" in the construction. (Pl. Opening at 21.) To support its position, SpendingMoney cites to a number of cases where some variant of the phrase has been included in the construction of the structure of the element. Those cases are discussed below.

---

[2] The specification does not show that the patentee chose to be his own lexicographer and use the term in a manner other than its ordinary meaning. *See Markman*, 52 F.3d at 980.

Defendants argue the language is not properly included in the construction of a means-plus-function element. Defendants argue that the element must be construed as a matter of law to identify the function and the corresponding structure disclosed in the specification for performing that function,[3] and that whether any equivalents to the identified structure exist and what those equivalents are is a factual issue for the jury, not a legal issue for claim construction. (Def. Br., doc. # 88, at 22.) They argue the court's role is limited to identifying the actual corresponding structure disclosed in the specification for performing the claimed function.[4]

It is indisputable that section 112, paragraph 6 equivalency is a question of fact. *See Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268-69 (Fed. Cir. 1999). Moreover, the structural equivalents anticipated by section 112, paragraph 6 are limited to those that were available at the time of the issuance of the patent. *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320 (Fed. Cir. 1999) ("An equivalent structure or act under § 112 cannot embrace technology developed after the issuance of the patent because the literal meaning of a claim is fixed upon its issuance."). Those rules, however, do not mandate omitting SpendingMoney's desired language. Including the phrase "and equivalents thereof" leaves open the factual question whether equivalents exist, and principally affects the wording of the instructions to the jury.

SpendingMoney cites numerous cases in which district courts have included a variation

---

[3] Although the defendants initially argued that the language "that must be construed as a matter of law to identify the function and the corresponding structure disclosed in the specification for performing that function" should be incorporated into the construction, they conceded at the *Markman* hearing that the issue would be better addressed in the jury charge. (Tr. 60-61.)

[4] To support this argument, defendants cite to *JVW Enters.*, 424 F.3d at 1330. That case does not discuss the inclusion of this language, however, and accepted the district court's determination of structure without relevant discussion.

of the phrase "and structural equivalents thereof" in the construction of the claim terms.[5] Those cases do not discuss whether the phrase should be included, and in many cases, neither party disputed that the phrase should be included. Those cases recognize that the legal rule enunciated by the phrase is operative anytime paragraph 6 of section 112 applies.[6] It is true the court must identify the corresponding structure, but the statute requires that equivalent structures are also included in the claim construction. Including the phrase is not misleading and recognizes the legally operative rule.

As SpendingMoney identifies, the inclusion of the phrase has been rejected as a result of circumstances not present here, including additional limiting language, disclaimer, or adverse prosecution history. *See Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358-59 (Fed. Cir. 2001); *Metrologic Instruments, Inc. v. Symbol Techs., Inc.*, 460 F. Supp. 2d 571, 586-87 (D.N.J. 2006).

Accordingly, I include the phrase "and structural equivalents thereof" in the construction

---

[5] *In re Vtran Media Techs., LLC, Patent Litig.*, MDL Dkt. No. 1948, 2009 U.S. Dist. LEXIS 61328 (E.D. Pa. July 17, 2009) (including "and structural equivalents thereof" in construction); *Pressure Prods. Med. Supplies, Inc. v. Enpath Med., Inc.*, Civil Action No. 9:06-CV-121, 2008 U.S. Dist. LEXIS 21583 (E.D. Tex. Mar. 19, 2008) ("and structural equivalents thereof"), *rev'd in part by Pressure Prods. Med. Supplies v. Greatbatch Ltd.*, 599 F.3d 1308 (Fed. Cir. 2010); *PolyVision Corp. v. Smart Techs., Inc.*, 501 F. Supp. 2d 1042 (W.D. Mich. 2007) ("and structural equivalents thereof"); *Metrologic Instruments, Inc. v. Symbol Techs., Inc.*, 460 F. Supp. 2d 571 (D.N.J. 2006) ("and their structural equivalents"); *Genlyte Thomas Grp. LLC v. Lutron Elecs. Co.,* Civil Action No. 3:02-CV-0602-K, 2004 U.S. Dist. LEXIS 5311 (N.D. Tex. 2004) ("and equivalents thereof"); *Genzyme Corp. v. Atrium Med. Corp.*, 212 F. Supp. 2d 292, 340 (D. Del. 2002) ("and structural equivalents thereof"); *Intel Corp. v. Broadcom Corp.*, 172 F. Supp. 2d 516 (D. Del. 2001) ("and structural equivalents").

[6] The lack of analysis in *Al-Site Corp. v. Bonneau Co.*, 33 U.S.P.Q.2d 1136, 1139 (Fed. Cir. 1994), on this issue demonstrates the point. In *Al-Site*, the parties contested the identified structure. In its ruling on the issue, the Court stated that the interpretation included the one disclosed structure "and structural equivalents thereof."

of each of the terms discussed below.

        1.    *Term: "means for storing on the satellite card the satellite account number"*

The parties agree that the function of this element should be construed as "storing on the satellite card the satellite account number." The parties dispute the identification of corresponding structure for this means-plus-function element. Defendants argue that the structure is "a magnetic strip." (JCC Stmt. at 2.) Plaintiff argues it is "a magnetic strip, a chip, a printing or an embossment and all structural equivalents thereof." (*Id.*)

To reiterate, at the second step of construing a means-plus-function term, the court must "identify the corresponding structure in the written description that performs that function." *JVW Enters., Inc.*, 424 F.3d at 1330. A structure is only deemed "corresponding" where the "specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). "The specification must be read as a whole to determine the structure capable of performing the claimed function." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379 (Fed. Cir. 2001).

Defendants argue that the only structure disclosed in the specification that is clearly linked or associated to the function "storing on the satellite card the satellite account number" is a magnetic strip. ('803 Patent col. 6, ll. 15-18). SpendingMoney argues that, because the specification refers to "other data storage means," the structure is not limited to a magnetic strip. It further argues that various other structures are sufficiently identified in the specification to be included. (*Id.*, Pl. Reply Br. at 9.) The specification states: "The satellite card is preferably

provided with . . . a magnetic strip or other data storage means for storing at least the" satellite card account number ('830 Patent col. 6, ll. 14-17) and "[p]referably, the satellite card has a substantially similar structure to that of the host credit card." ('830 Patent col. 6, ll. 17-19.)

SpendingMoney argues that:

> At the time the '830 patent application was filed in 1997, most Americans, and certainly a person of ordinary skill in the credit card industry would have known that the account number of a typical credit card was stored on the card using some type of magnetic strip, chip, printing, embossment, or combination thereof.

(Pl. Opening at 18.) SpendingMoney argues that one of ordinary skill would have recognized that by equating the structure of the satellite card to the structure of a credit card, the specification "describes a magnetic strip, a chip, a printing, and an embossment for performing the function 'storing on the satellite card the satellite account number.'" (*Id.* at 19.)

In support of its argument that a chip should be included in the disclosed structure, SpendingMoney cites[7] the specification's description of a prior-art stored value card: "A stored value card . . . is purchased from an issuer in a fixed amount. That amount is 'stored' in a chip or magnetic stripe on the plastic card or substrate." ('830 Patent col. 2, ll. 50-52.) The specification thus expressly equates a chip with a magnetic stripe (or "strip") in describing structures capable of being used to store information on plastic cards.

---

[7] SpendingMoney additionally cites (1) an August 1983 article from *Fortune* magazine that heralds the arrival of the "smart card," which "contains a microprocessor and a memory chip and enables data to be stored directly in the card . . . . The microchip card offers a secure system for access to banking transactions, databases, and . . . could be used for such things as identification [and] stock brokerage accounts"; (2) a March 1985 article from *Computer Management* magazine that states, "smart cards also have the capability of storing actual account details and balances for the cardholder to access"; and (3) "various articles from 1983 to 1995 discussing the use of chips to store account numbers." (*Id.* at 18 & Ex. D.) Because I find the claims and specification clear on this point, I need not rely upon this extrinsic evidence.

Defendants' proposed construction is unduly restrictive and fails to acknowledge that the specification indicates that the structure may be a magnetic strip or a data chip. I agree that a person of ordinary skill in the art would have understood that the disclosed structure included a data chip.

With respect to printing and embossing, SpendingMoney argues that "it is common knowledge that even today credit cards still typically have the account number embossed or printed on them." (*Id.* at 19.) First, nowhere in the specification is embossing or printing mentioned. Additionally and more importantly, SpendingMoney ignores the context of "data storage means" in the specification. The term is described as a means for "storing" the satellite account number. ('830 Patent col. 6, ll. 5-7, 16-17.) Although it is true that credit cards typically have an account number embossed on printed on them, a person skilled in the art would not understand that the embossing or printing is a structure for "storing" that number on the credit card; rather, embossing and printing "display" the number on the credit card. Likewise, embossing and printing are not reasonably understood to be structures for "storing" an account number on a satellite spending card to facilitate debits of purchases from the card spending capacity; instead, as used in the specifications and as discussed below, embossing and printing are structures for displaying information that permits identification of the cardholder when the card is used. The specification does not support SpendingMoney's argument to include embossing or printing as disclosed structures for storing account numbers.

Accordingly, I conclude that the corresponding structure in the written description is "a magnetic strip or data chip and structural equivalents thereof."

2. *Term: "means on the card for displaying at least a portion of the configuration data sufficient to identify the satellite cardholder"*

The parties agree that the function to which this claim is directed is "displaying at least a portion of the configuration data sufficient to identify the satellite cardholder." Each party suggested that I identify the structure corresponding to this function as "information printed, embossed, or otherwise displayed on the card sufficient to identify the satellite cardholder."[8] Adopting the parties' agreement and consistent with my ruling regarding structural equivalents, I construe the structure of the term as "information printed, embossed, or otherwise displayed on the card sufficient to identify the satellite cardholder and structural equivalents thereof."

## IV. Conclusion

For the reasons discussed above, the terms at issue in this litigation are construed as follows:

"Satellite spending card" or "satellite card": "a prepaid spending card, which has the functionality of a credit card, and is linked to the host credit card."

"Means for storing on the satellite card the satellite account number": the function to which the claim is directed is "storing on the satellite card the satellite account number"; the corresponding structure is "a magnetic strip or data chip and structural equivalents thereof."

"Means on the card for displaying at least a portion of the configuration data sufficient to identify the satellite cardholder": the function to which the claim is directed is "displaying at

---

[8] JCC Stmt. at 3; Pl. Opening at 6, 20. The record of SpendingMoney's proposed structure is somewhat confusing. Although in the opening brief it consented to the phrase "otherwise displayed," it later sought to use the word "included." JCC Stmt. at 3. Because the parties did not identify any real dispute about this aspect of the structure and because both parties agreed to "otherwise displayed," that is the construction I adopt.

least a portion of the configuration data sufficient to identify the satellite cardholder"; the corresponding structure is "information printed, embossed, or otherwise displayed on the card sufficient to identify the satellite cardholder and structural equivalents thereof."

The term "available balance of the host credit card" requires no construction and can be accorded its plain meaning. As agreed by the parties, the terms "data processing device" and "linking, in the data processing device, the satellite account record to the host account record" do not need construction and can be accorded their plain meanings. I adopt the parties' agreed-upon construction of the term "host cardholder determined spending capacity" as "the maximum amount that can be spent using the satellite card, as fixed by the host cardholder."

It is so ordered.

Dated at Bridgeport, Connecticut, this 18th day of July 2011.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge