UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SPENDINGMONEY LLC,
      Plaintiff,

      v.

AMERICAN EXPRESS CO., ET AL.,
      Defendants.

No. 3:08cv1376 (SRU)

RULING ON MOTIONS FOR SUMMARY
JUDGMENT OF NON-INFRINGEMENT

SpendingMoney LLC ("SpendingMoney") is the assignee of U.S. Patent No. 5,864,830 (the "'830 Patent"), Data Processing Method of Configuring and Monitoring the Satellite Spending Card Linked to A Host Card. SpendingMoney filed suit on September 10, 2007. It filed an amended complaint (doc. # 50) on January 23, 2009 alleging, *inter alia*, patent infringement against American Express Co. ("American Express") and Visa USA, Inc. ("Visa").[1] Both American Express (**doc. # 103**) and Visa (**doc. # 119**) have moved for summary judgment and a ruling of non-infringement. SpendingMoney filed motions to strike (**docs. ## 169, 170**). For the following reasons, the motions for summary judgment are **GRANTED** and the motions to strike are **DENIED**.

I.     **Background**

SpendingMoney is a limited liability company organized and existing under the laws of the State of Delaware, with its principal office in Stamford, Connecticut. American Express is a corporation organized and existing under the laws of the State of New York with its principal

---

[1] In an oral ruling on May 22, 2009 (doc. # 83), I dismissed Count III of the amended complaint, which alleged violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110g, by both defendants.

place of business in New York, New York, and Visa is a corporation organized and existing

under the laws of the State of Delaware with its principal place of business in Foster City,

California.

     A.    The '830 Patent

The '830 Patent, Data Processing Method of Configuring and Monitoring a Satellite

Spending Card Linked to a Host Credit Card, was filed on February 13, 1997 as Application No.

08/799,953 and issued on January 26, 1999 to David Armetta and David Tempest.  (Decl. of

Frank T. Carroll ("Carroll Decl."), Ex. 1, '830 Patent.)

     According to SpendingMoney, the patent "is directed to a data processing method of

configuring a satellite spending card.  [It] addresses the problem of how to provide an individual,

such as a teenager, with access to money while maintaining control of the teen's spending."

(SpendingMoney Mem. in Opp. to Visa's Motion for Summ. J. ("Pl. Mem."), doc. # 152, at 2.)

     The '830 Patent issued with ten claims.  SpendingMoney is asserting infringement of

Claims 1, 3, 6, 8 and 10 against American Express and Claims 1, 3, 6 and 10 against Visa.

Claim 1 is the only independent claim.[2]  It claims:

> 1. A data processing method of configuring a satellite spending card linked to a host
> credit card and issued by an issuer, the host credit card being held by a host cardholder
> and having an available balance defined in an associated host account data processing
> record of a data processing device, a predetermined spending capacity of the satellite card
> being selectively determined by the host cardholder, comprising the steps of:
>
> (a)    entering, into a data processing device, configuration data comprising an identifier
>        of a satellite cardholder of a satellite card and a host cardholder determined
>        spending capacity of the satellite card;
> (b)    subtracting, in the data processing device, the entered spending capacity of the
>        satellite card from the available balance of the host credit card;
> (c)    storing, in a satellite account record in the data processing device, the
>        configuration data entered in said step (a);

---

[2] Dependent claims 3, 6, 8 and 10 are deemed to incorporate all of the limitations of
Claim 1, to which they refer.  35 U.S.C. § 112 ¶ 4.

(d)   linking, in the data processing device, the satellite account record to the host account record to facilitate future transfers of funds from the host account record to the satellite account record;

(e)   defining a satellite account number associated with the satellite account for use in financial transactions carried out with the satellite card and limited in total amount to the satellite card spending capacity;

(f)   issuing the satellite card having means for storing on the satellite card the satellite account number so that each purchase made with the satellite card by the satellite cardholder is debited from the satellite card spending capacity, and means on the card for displaying at least a portion of the configuration data sufficient to identify the satellite cardholder so that only the satellite cardholder identified on the satellite card can use the satellite card for financial transactions in a total amount limited by the satellite card spending capacity; and

(g)   tendering the satellite card to the satellite cardholder for use by satellite cardholder in carrying out financial transactions with the satellite card and limited in total amount to the satellite card spending capacity.

('830 Patent col. 6, ll. 58-67, col. 7, ll. 1-31.)

B.    The Visa Buxx Card and American Express Products

SpendingMoney alleges that Visa has infringed the '830 Patent through the Visa Buxx Card. Visa launched Visa Buxx in 2000. (Carroll Dec., Ex. 2, Choi 30(b)(6) Dep. at 107:4-6.) Visa has submitted evidence indicating that, unlike Visa charge cards and credit cards, the Buxx Card had numerous restrictions on how the card could be used by cardholders. Visa has additionally submitted evidence that it does not issue Buxx Cards. That evidence and its implications are discussed below.

SpendingMoney alleges that American Express violated the '830 Patent by issuing the Travelers Cheque Card.[3] The American Express Travelers Cheque Card (and its predecessor) was a prepaid card sold by American Express between May 1999 and December 2000, and again

---

[3]   SpendingMoney submitted a supplemental affidavit (doc. # 158) indicating that American Express offered for sale a prepaid card product called "PASS Card" on May 3, 2010. American Express has represented that the PASS Card has similar user restrictions to the Travelers Cheque Card and SpendingMoney has not disputed that representation with evidence specific to the PASS Card. Accordingly, I analyze only the Travelers Cheque Card and evidence

between August 2003 and October 2007.  (*See* Decl. of Wesley Wright ("Wright Decl."), doc. # 108, ¶ 7; Decl. of Frances Codd Slusarz ("Slusarz Decl."), doc. # 150, Ex. 1, at 3.)  American Express has submitted evidence indicating that, unlike American Express's charge cards and credit cards, the Travelers Cheque Card had numerous restrictions on how the card could be used by cardholders.  (Wright Decl. ¶ 8.)  That evidence and its implications are discussed below.

## II.    Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").  When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present significant probative evidence to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

---

submitted in connection with that product.

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).  If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48.  To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim).  The Federal Circuit has determined that in light of *Celotex*, "we conclude that nothing more is required than the filing of a summary judgment motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused systems did not meet the claim limitations."  *Exigent Tech. v. Atrana Solutions, Inc.*, 442 F.3d

1301, 1309-10 (Fed. Cir. 2006).  In short, if there is no genuine issue of material fact, summary judgment may enter.  *Celotex*, 477 U.S. at 323.

**III.**   **Discussion**

   A.   Direct Infringement

SpendingMoney alleges direct infringement by both Visa and American Express.  A determination of direct infringement requires a two-step analysis: "First, the meaning and scope of the relevant claims must be ascertained.  Second, the properly construed claims must be compared to the accused device."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004) (citations omitted).

Regarding the first step, I held a *Markman*[4] hearing on September 9, 2009 to determine the meaning and scope of the disputed claim terms and ruled on a construction for the main term at issue in the instant motions.  I later issued a ruling determining the construction of the remaining claim terms (doc. # 183).

Step two requires a comparison of the properly construed claims to the accused product to determine whether that product contains all of the limitations of the asserted claims, either literally or by equivalents.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1365 (Fed. Cir. 2002); *Innova/Pure Water*, 381 F.3d at 1115.

   1.   *Step One:  Claim Construction*

      a.   *Markman* Hearing

At the *Markman* hearing, I construed the claim term "satellite spending card" or "satellite card" as follows: "a prepaid spending card, which has the functionality of a credit card, and is linked to the host credit card."  I also ruled that the term "available balance of the host credit

card" requires no construction and can be accorded its plain meaning.  The parties agreed that the terms "data processing device" and "linking, in the data processing device, the satellite account record to the host account record" do not need construction and can be accorded their plain meanings, and I accepted their stipulation.  I adopted the parties' agreed-upon construction of the term "host cardholder determined spending capacity" as "the maximum amount that can be spent using the satellite card, as fixed by the host cardholder."

I later issued a claim construction ruling in which I ruled on the remaining terms.  In that ruling, I construed the following terms: (1) "means for storing on the satellite card the satellite account number": the function to which the claim is directed is "storing on the satellite card the satellite account number" and the corresponding structure is "a magnetic strip or data chip and structural equivalents thereof"; (2) "means on the card for displaying at least a portion of the configuration data sufficient to identify the satellite cardholder":  the function to which the claim is directed is "displaying at least a portion of the configuration data sufficient to identify the satellite cardholder" and the corresponding structure is "information printed, embossed, or otherwise displayed on the card sufficient to identify the satellite cardholder and structural equivalents thereof."

b.  "Functionality of a Credit Card"

As noted above, at the *Markman* hearing I construed the term "satellite spending card" or "satellite card" as "a prepaid spending card, which has the functionality of a credit card, and is linked to the host credit card."  The parties now contest what is meant by "functionality of a credit card."

---

[4]  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995).

The '830 Patent's specification[5] discusses what is meant by "functionality of a credit card."  For example, it states that:

> [D]ebit cards do not enjoy the functionality of credit cards in many business transactions. For example, *renting a hotel room or a car* typically requires a conventional credit card *for security deposit purposes* even if the ultimate balance is settled in cash.  And unlike debit cards, *credit cards may be used to make purchases by telephone, through the mail, or over the Internet*.
>
> * * *
>
> A satellite card in accordance with the present invention has several distinct advantages over debit cards and stored value cards.  First, a satellite is a credit card for all practical purposes and thus enjoys the many advantages of a credit card.  For example, a satellite card may be used *when a security deposit is required or when making a purchase by telephone, mail, or over the Internet*.

('830 Patent col. 2 ll. 42-49; col. 3 ll. 61-67) (emphasis added.)[6]  The specification, therefore, indicates that "functionality of a credit card" means, at least in part, that a satellite card is able to be used for the same transactions as a credit card.

As contained in the specification, the concept of "functionality of a credit card" focuses on the attribute that a credit card carries a credit line and functions differently in the market than payments by other methods, such as cash, checks, or debit cards.  When a merchant accepts a credit card for payment by a customer, it does so on the condition that the issuer or its agent has made additional funds available to that customer through a line of credit.[7]  It is that promise of

---

[5] The Federal Circuit has held that the specification is "the single best guide to the meaning of a disputed term."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

[6] Furthermore, inventor David Tempest described a satellite card as follows:  if "you can use your credit card that way," "then you could use a SpendingMoney card the same way" as long as it had sufficient funds.  (Ex. D, Tempest Dep., at 73:22-76:3.)

[7] *See* Levitt Decl. at ¶ 8 ("American Express restricted the Travelers Cheque Card from being used for reservations, lodging check-in, or vehicle check-out because it was a prepaid card without a line of credit.  The prepaid funds that may have been available at lodging check-in or vehicle check-out could be spent before vehicle return or lodging check-out, and therefore not

funds extended on credit that enables merchants such as rental car companies to allow credit cards to reserve rental cars and hotel rooms.  Thus, to be a "satellite card," a card must function as a credit card in the marketplace.

SpendingMoney attempts to distinguish between merchants' acceptance of the satellite card and its functionality.  It argues that whether the card can be used to rent a car, for example, depends upon whether the car company accepts the card, rather than whether the card has the functionality of a credit card.

The distinction between "functionality" and "acceptance" was discussed at the *Markman* hearing.  At that time, I noted that the plain meaning of "acceptance" is whether a merchant has a contract with a particular brand of card and accepts an offer by a customer to use that brand of card to purchase merchandise.  The '830 Patent claims a method for data processing such that, if a merchant accepts a MasterCard credit card for payment, it will also accept a MasterCard SpendingMoney card.[8]  If a merchant does not accept a MasterCard at all, however, the holder will not be able to use a MasterCard credit card nor a MasterCard debit card – nor a MasterCard SpendingMoney card – to pay that merchant.

SpendingMoney mischaracterizes my description of "acceptance" when it states that acceptance is "whether the card will be accepted by a merchant for a particular type of purchase."  (SpendingMoney Reply to American Express, doc. #148, at 3.)  The particular type of purchase is of no import; the question of acceptance is whether a particular merchant has an agreement with a particular financial services company binding the merchant to accept the

---

available to pay for the rental car or lodging transactions.").
    [8] Under the method described in the patent, the converse should also be true:  if a merchant does not accept a MasterCard SpendingMoney card, it also does not accept a MasterCard credit card.

company's cards for payment by a customer.

In attempting to distinguish between functionality and acceptance, SpendingMoney ignores the use of "functionality" in the '830 Patent specification.  As discussed in the specification, a credit card includes the following functionalities:  rent a hotel room; rent a car; and order merchandise or services by telephone, mail, or over the Internet.  Since a satellite card has the same functionalities as a credit card, if a card does not have those functionalities in the marketplace, then it cannot be a satellite card.

> 2.  *Step Two: Comparison*

In the second step of a direct infringement analysis, I compare the properly construed claims to the accused products.  The issue is whether an accused product or method contains all of the limitations or steps of the asserted claims.

> a.  American Express

The '830 Patent claims a "data processing method of configuring a satellite spending card linked to a host card."  Thus, to prove infringement of claims 1, 3, 6, 8, or 10 of the '830 Patent, SpendingMoney must prove, in addition to all of the other claim requirements, that an alleged infringing card was a "satellite spending card."  As noted above, that means that SpendingMoney must prove that the Travelers Cheque Card is "a prepaid spending card, which has the functionality[9] of a credit card, and is linked to the host card."

---

[9] Indeed, the '830 Patent's specifications note that the satellite card has not just the functionality of a credit card, but that it has all of the functionality of a credit card:

> Each of the primary and secondary cards is, except as otherwise described hereinabove, akin to a conventional card having all of the attributes and advantages and functionality of such a card.
> ***
> The satellite card of the invention provides an ideal solution [to the problem of how to

American Express's principal argument is that the Travelers Cheque Card was configured not to have the functionalities of a credit card and that American Express therefore cannot have directly infringed the patent.[10]   American Express lists four ways that it prevents the Travelers Cheque Card from functioning as a credit card: (1) American Express prints restrictions on the card itself, (2) there are restrictions in the cardholder agreements, (3) there are restrictions in American Express's computer systems, and (4) there are restrictions in the merchant agreement.

American Express has shown that the Traveler Cheque Card contained text on its back which noted that "USE OF THIS CARD IS SUBJECT TO THE ACCOMPANYING AGREEMENT," "THIS IS NOT A CREDIT/DEBIT CARD" and

> An American Express Travelers Cheque product, issued by American Express Travel Related Services Company, Inc.  Purchases exceeding available funds are prohibited.  Not valid for telecom or person-to-person payments.  May be used to pay for hotels/car rental at the conclusion of the stay/rental, but not for reservations nor at hotel check-in nor rental car pick-up.  Some other restrictions may apply.  Fees may apply.  See Agreement.

(American Express Reply to Opp'n to Summ. J., Ex. E, Decl. of John C. Spaccarotella.)

The TravelFunds/Travelers Cheque Card cardholder agreement further restricted usage of the Travelers Cheque Card.  The agreement stated that:

---

> provide a college student with funds] because the child may enjoy all of the benefits of a conventional credit card with a spending capacity that is directly controlled by the parents.

('830 Patent col. 3 ll. 33-36; col. 4 ll. 29-33).

[10]   American Express has shown that the Travelers Cheque Card could not be used to reserve a rental car; to reserve a hotel room; pay for gasoline at a pump through automated terminals; pay for person-to-person Internet payment products; pay for telecom charges (including cellular, airplane telephones, payphones, home phone service, etc.); pay for recurring billing charges, such as health club memberships or subscriptions; make installment payments in the future for goods/services received in the present; pay for home repair services such as plumber, electrician, or painter/decorator; pay for Internet electronic services including electronic mail, Internet service provider, and Internet telecom.  (Wright Decl. Exs. A at 5-6, B at

> Since Travelers Cheque Cards are prepaid cards, they are not intended for use
> in certain industries.  You are NOT permitted to use the Travelers Cheque
> Card:
> • To *reserve a rental car*, or when picking up a rental car.  However, at the
> end of a car rental, you can use your Card to pay for the rental.
> • To *reserve a hotel/motel room*, or when checking into a hotel/motel or other lodging
> establishment.  However, at the end of your stay, you can use your Card to pay for your
> stay.
> • To pay for gasoline/petrol "at the pump" through automated terminals.  However,
> you can use your Card to pay for gasoline by presenting the Card in the station or to a
> service station attendant.

(Wright Decl. Exs. A, B.) (emphasis added.)

American Express also entered into acceptance agreements with merchants that contained

additional restrictions on uses of the Travelers Cheque Card.  Those agreements "specifically

prohibited merchants from accepting prepaid cards for reserving a room or during check-in for a

lodging stay."  (Levitt Decl. at ¶¶ 3, 5; Slusarz Decl. Ex. 5, at AMSM0054867; Slusarz Decl. Ex.

6, at AMSM0054881) (noting that Acceptance Agreements states that merchants "must not

accept Prepaid Cards at check-in for purposes of Authorization or payment," and that merchants

"must accept all Cards, except Prepaid Cards, to reserve accommodations until the published

check-out time on the day following the scheduled arrival date (*Assured Reservations*).  You

must not accept Prepaid Cards for Assured Reservations.")

American Express provided lodging and vehicle rental merchants with the Bank

Identification Numbers ("BINs") of Travelers Cheque Cards, in order to enable them to

electronically program their systems to decline prepaid cards.  (Levitt Decl. at ¶ 7.)  Merchants

such as Dollar Thrifty Automotive Group, Enterprise Rent-A-Car Company, and Avis Budget

Car Rental electronically programmed their systems to prevent Travelers Cheque Cards from

being used for reservations or vehicle check-out.  (*Id.*)

---

1, 4-5.)

Fourth and finally, American Express configured its computer systems to prohibit many Travelers Cheque Card transactions.  American Express had a computer program called the Stored Value Card Authorization Platform ("SVCAP").  (Wright Decl. Ex. C at 1.)  SVCAP was programmed to prevent the Travelers Cheque Card from being used for certain purchases.  "In particular, the Travelers Cheque Card could not be used to pay for Internet telecommunications, pay for an Internet service provider, rent cars over the Internet, purchase auto related goods over the Internet, or pay for Internet subscriptions.  An American Express charge card or credit card could be used to pay for such Internet-related services."  (Wright Decl. at ¶ 11; *see also id.* Ex. C at AMSM0054809-10, listing excluded industries.)

These four restrictions prevented the Travelers Cheque Card from having the functionality of a credit card.  SpendingMoney attempts to refute this point by arguing that two of the layers of restrictions – the merchant acceptance agreements and SVCAP – were imperfect.

SpendingMoney argues first that SVCAP failed to prevent the prohibited transactions. The parties agree that SVCAP was able to exclude entire retailers and industries, but not specific types of transactions.  Furthermore, although SVCAP prevented Travelers Cheque cardholders from renting cars over the Internet, SVCAP did not prevent cardholders from renting cars over the phone or in person.

SpendingMoney next argues that several of the merchant acceptance agreements American Express entered into did not contain the alleged restrictions.  (SpendingMoney Opp'n to American Express Mot. for Summ. J. at 5.)  SpendingMoney points specifically to the acceptance agreements of Hilton Hotels Corporation, Best Western International, Inc., and

Choice Hotels International, Inc.[11]  (Slusarz Decl. Exs. 10-12.)  SpendingMoney also argues that the form acceptance agreements did not restrict the use of prepaid cards when rental vehicles were checked out.  (SpendingMoney Opp'n to American Express Mot. for Summ. J. at 5.)

Any flaws in the merchant acceptance agreements and SVCAP are not fatal to American Express's motion for summary judgment, because they were not the only mechanisms used to restrict consumer transactions.  For instance, there is no dispute that the Travelers Cheque Card had printed on it at all relevant times a restriction that stated it "[m]ay be used to pay for hotels/car rentals at the conclusion of the stay/rental, but not for reservations nor at hotel check-in nor rental car pick-up."  Neither does SpendingMoney dispute that the cardholder agreement contained pertinent usage restrictions at all relevant times.[12]

Even if it was theoretically possible for the Travelers Cheque Card to be used as a credit card, that fact is insufficient to conclude that the card had the functionality of a credit card.  It is not enough that the defendant's card was *capable* of infringing the patent.  Instead, SpendingMoney must present evidence that the apparatus *actually* infringed the '830 Patent.  *See Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 90 Fed. Appx. 540, at *4 (Fed. Cir. 2004); *see also Cybersettle, Inc. v. National Arbitration Forum, Inc*., 243 Fed. Appx. 603, 606-07 (Fed. Cir. 2007) ("A patented method is a series of steps, each of which must be performed for infringement to occur.  It is not enough that a claimed step be 'capable of being performed.'");

---

[11] SpendingMoney also argues that the Marriott International's acceptance agreement did not contain the alleged restriction.  The text of the agreement, however, indicates otherwise.  The acceptance agreement states that the Assured Reservations program "is available for all Cards, *other than Prepaid Cards*."  (Slusarz Decl. Ex. 9, at 10.) (emphasis added.)

[12] SpendingMoney argued at the hearing on the summary judgment motions that I should make the "fair assumption" that cardholders failed to read or disregarded the restrictions in the cardholder agreement.  SpendingMoney failed to provide evidence that any cardholder in fact failed to read these documents or disregarded their restrictions, and cannot rest on mere

*Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Method claims are only infringed when the claimed process is performed . . . .").

American Express created several mechanisms to prevent the Travelers Cheque Card from operating as a credit card, and SpendingMoney has failed to present evidence that all of those mechanisms failed to do so.  The Travelers Cheque Card did not have the functionality of a credit card, and therefore was not a satellite card.  Thus, the Travelers Cheque Card did not infringe the '830 Patent, and American Express is not liable for direct infringement.

      b.   <u>Visa</u>

Visa makes two principal arguments against direct infringement.  First, it claims that it did not perform the claimed step of issuing Buxx cards, and thus cannot be a direct infringer.  Second, like American Express, Visa claims that its product did not have the functionality of a credit card.

      i.   *Issuance of Visa Buxx Card*

As admitted by SpendingMoney, the '830 Patent "is directed to a data processing method of configuring a satellite spending card."  "A patented method is a series of steps, each of which must be performed for infringement to occur.'"  *Cybersettle,* 243 Fed. Appx. at 606-07.  The sixth step of the '830 Patent is "issuing the satellite card."

Visa has submitted evidence that it does not issue Visa Buxx Cards to cardholders.  Instead, it is undisputed that non-party banks issue the cards.  Those issuing banks include Bank of America, U.S. Bank, First Tennessee, National City Bank, and various Metavante Banks (including American Bank & Trust, Area Bank, and Bankers Bank).  (Carroll Decl., Ex. 3, Diamond Dep. at 31:16-33:24.)  Thus, because Visa does not perform the step of "issuing the

---

speculation to defeat a motion for summary judgment.

satellite card," Visa has not performed all of the steps of the patented method.

SpendingMoney argues that even if Visa itself did not actually issue the Visa Buxx Cards, Visa is still liable for direct infringement under a theory of joint infringement.  The Federal Circuit has held that, although typically direct infringement requires a party to have performed every step of a patented method, "the law imposes vicarious liability on a party for the acts of another in circumstances showing that the liable party controlled the conduct of the acting party.  In the context of patent infringement, a defendant cannot thus avoid liability for direct infringement by having someone else carry out one or more of the claimed steps on its behalf." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379 (Fed. Cir. 2007) (internal citations omitted).  Thus, Visa can be liable for direct infringement if it contracts out one of the steps of a patented process to another entity, so long as it "controls" or "directs" the issuing banks' infringement.  *Id.* at 1380-81.

The relevant inquiry, then, is the level of control Visa had over the issuing banks. "[W]here the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'" *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008).  "At the other end of this multi-party spectrum, mere 'arms-length cooperation' will not give rise to direct infringement by any party."  *Id.*  Furthermore, to satisfy the requirements of the '830 Patent, Visa must not have only directed the issuing banks to issue the Visa Buxx Cards, but to issue them so that they (1) had means for storing on the Visa Buxx Card the satellite account number, so that each purchase made with the card was debited from the Buxx spending capacity; and (2) had means on the Buxx Card for displaying at least a portion of the configuration data sufficient to

-16-

identify the cardholder so that only the cardholder identified on the card could use it for financial transactions in a total amount limited by the card spending capacity.

Here, there is evidence that Visa had some control over the issuers.  Visa had several requirements that issuers of Visa Buxx had to follow.  For instance, Visa Buxx cards had to be a prepaid product, with the Visa brand on it, that contained a magnetic stripe, and was embossed with the teen cardholder's name, the account number, and the expiration date.  (Vriheas Decl., Ex. 2 at 2-4.)  Issuers did have some latitude to make decisions.  The issuers were allowed to set "all cardholder pricing, and the terms and conditions for their own Visa Buxx card payment product."  (*Id.*)  The issuer could also make decisions such as whether value could be loaded by the teen, or by an authorized gift giver, and whether paper enrollment was allowed.  (*Id.*)

Visa argues that there is insufficient evidence of control here.  In support, it cites *Emtel, Inc. v. Lipidlabs, Inc.*, 583 F. Supp. 2d 811 (S.D. Tex. 2008).  In that case, the plaintiff claimed infringement of a "telemedicine" method that used videoconference to allow a physician to communicate with a medical caregiver and patient in a remote healthcare facility.  Patent steps included diagnosing the patient's condition, and providing instructions for the treatment of the patient.  Although the defendant had hired physicians for a telemedicine endeavor, the defendant had no involvement in *how* the physicians diagnosed patients or instructed in their treatment.  *Id.* at 838.  Here, in contrast, Visa has not only contracted with the issuing banks to issue Visa Buxx cards, but has provided them instructions regarding how that issuance can be done.  In short, there is enough evidence in the record that Visa directed and controlled the banks' issuance of the Visa Buxx card that a reasonable jury could find Visa jointly liable for any infringement.

ii.     *Functionality of a Credit Card*

Visa next argues that it should not be held liable because the Visa Buxx card did not have

the functionality of a credit card, as required by the *Markman* definition.  Visa claims that rental

car agencies will not accept prepaid cards as security deposits for car rentals, but do accept credit

cards for that purpose.  Visa also has stated, and SpendingMoney does not dispute, that at least

four rental car merchants (Hertz, Avis, National, and Enterprise) asked Visa to supply them with

BIN numbers, so that the companies could identify and refuse to accept Visa Buxx cards used to

reserve rental cars.  (Vriheas Dep. at 47:1 – 49:13.)  As noted above, the ability to use a card as a

security deposit for a rental car is one functionality of a credit card.

　　　SpendingMoney argues that other car rental companies may not have asked Visa to

supply them with BIN numbers in order to prevent Buxx cards from being used as a security

deposit.  Visa Opp'n to Mot. for Summ. J. at 14.  SpendingMoney has not, however, put forward

any evidence to that effect.  Even if it had, the fact would remain that the Visa Buxx card in at

least some situations did not have the functionality of a credit card.

　　　SpendingMoney next argues that even if some rental car agencies did not accept the Visa

Buxx card for security deposits, the card was configured to be capable of being accepted.

SpendingMoney is incorrect.  There are two aspects to functionality of a credit card: (1) what the

card could do if the defendant permitted it, and (2) what the defendant actually permits the card

to do.  In order for Visa to be liable, both aspects of functionality must be present.

SpendingMoney cannot rely on evidence that the card was *capable* of infringing the patent, but

must also present evidence that it actually *did* infringe the patent.  *See Epcon*, 90 Fed. Appx. at

*4; *see also Cybersettle*, 243 Fed. Appx. at 606-07 ("A patented method is a series of steps, each

of which must be performed for infringement to occur.  It is not enough that a claimed step be

'capable of being performed.'"); *Ormco Corp.*, 463 F.3d at 1311 ("Method claims are only

infringed when the claimed process is performed . . . .").

As noted above, SpendingMoney's patent "is directed to a data processing method of configuring a satellite spending card."  (Pl. Mem. at 2.)  The "configuring" aspect of the definition requires that the card and the system controlling the card work together to allow an infringement.  For example, if the patent were for a method of unlocking a door with a key, the accused product would need to not only have the characteristics of a key, but also be able to open locks.  Here, the patent is a data processing method.  As a result, it is not enough that Visa issued cards that looked and felt like credit cards.  The cards must also have been able to work like credit cards --- in other words, the cards must have been able to be used for all the purposes that a credit card can be used for.  Therefore, because Visa configured the Visa Buxx Card system so that the card could not be used at some rental car agencies, the card did not have the functionality of a credit card.  Because the card did not have the functionality of a credit card, it was not a satellite spending card, and there was no infringement.

## B.  Indirect Infringement

SpendingMoney advances an alternative theory of infringement against Visa only.[13] Patent law provides two theories for establishing indirect infringement:  inducement and contributory infringement.  35 U.S.C. §§ 271(b), (c).  In order for a plaintiff to succeed on a claim of indirect infringement, it must prove direct infringement by someone.  *See, e.g.*, *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1217, 1222-23 (Fed. Cir. 2007) ("Having demonstrated no instances of direct infringement, [the plaintiff] could not prove liability for induced or contributory infringement."); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363

---

[13]   Although SpendingMoney alleged contributory infringement and inducing infringement against American Express in Count I of the amended complaint, it did not raise those theories of liability in its opposition to American Express's motion for summary judgment or at the hearing on the motion and has thereby abandoned those theories of liability against

F.3d 1263, 1277 (Fed. Cir. 2004) (affirming summary judgment ruling of no indirect infringement because the patentee failed to prove direct infringement and failed to prove that the allegedly infringing device was not capable of substantial non-infringing use).  Because SpendingMoney has not demonstrated that any party directly infringed the patent,[14] it necessarily cannot demonstrate that Visa was an indirect infringer.

## IV.    Motions to Strike

SpendingMoney moved to strike (doc. # 169) portions of declarations submitted by Visa that refer to websites and matters over which the witnesses have no personal knowledge. Likewise, SpendingMoney has moved to strike (doc. # 170) portions of the affidavits submitted by American Express as not based on personal knowledge.  "On a summary judgment motion, the district court properly considers only evidence that would be admissible at trial."  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

I did not rely upon Visa's disputed information in determining that the Visa Buxx card was not a satellite spending card.  Therefore, SpendingMoney's motion to strike (**doc. # 169**) Visa's declarations is **DENIED AS MOOT**.

The Levitt and Wright declarations submitted by American Express are based on adequate personal knowledge to be admissible.  Levitt testified that she specifically drafted the confidentiality agreement between American Express and Avis Budget Car Rental concerning distribution of confidential BIN numbers.  (Slusarz Decl., Ex. 7, Levitt Tr. 58:5-14.)  Levitt also had personal knowledge of the prepaid card restricted-use contractual provisions in American

---

American Express.
    [14] SpendingMoney claims that Visa Debit Processing Services directly infringed the patent.  Because the Visa Buxx card does not meet the definition of a satellite spending card, however, that argument fails.

Express's Card Acceptance Agreements.  (Levitt Decl. ¶ 3, Exs. A-D.)  Wright sufficiently

identified and authenticated Exhibits A, B, and C of his declaration, based on his personal

knowledge.  (Wright Decl. ¶¶ 8, 10.)  SpendingMoney's motion to strike (doc. # 170) American

Express's evidence is **DENIED**.

**V.      Conclusion**

For the foregoing reasons, I conclude that Travelers Cheque Card is not a satellite card,

and therefore that American Express is not liable as a direct infringer.  I conclude that the Visa

Buxx card is not a satellite card, and thus that Visa is not liable as a direct infringer.

Additionally, because SpendingMoney has not demonstrated that anyone directly infringed the

patent, Visa cannot be liable for indirect infringement.  Therefore, no genuine issue of material

fact remains whether either Visa or American Express infringed the '830 Patent under any theory

and judgment must issue as a matter of law.

The motions for summary judgment (docs. ## 103, 119) are **GRANTED**.  The motions to

strike (docs. ## 169, 170) are **DENIED**.  The clerk shall close this file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 27th day of March 2012.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

-21-